Ms. Palmer. Also from the Philadelphia D.A.'s office, correct? That's right. That's right. Thank you. I think I'm shorter than my predecessors. That works. Good morning. May it please the respondents to hear how collectively we address the commonwealth for simplicity. If it's possible, I'd love to reserve a few minutes from now. That request will be granted. Thank you. As your honors are aware, the commonwealth of Pennsylvania in this appeal challenges the district court's responsibility, and probably so, of strafing a West Philadelphia block following a late-night picnic with 17 rounds of gunfire, killing 52-year-old Francis Rory to because prejudice determinations necessarily involve factual exploration and require the court to delve into the record. It sometimes obscures that this is very much a legal determination, and to state it more precisely, it's whether the state courts acted uneasily under the very deferential standard of NPOP, finding that Brown failed to establish prejudice to constitutional proportions under the equally deferential standard of Strickland, which, as this court is aware, under Harrington v. Richter and Collin v. Pinholster has been emphasized to be extremely difficult to meet. The state courts determined as a matter of law that even assuming that this term were to testify to the facts as outlined in his affidavit in his proper, and even if the state court assumed the credibility of that testimony that the jury were to have credited, that the testimony would not have created a reasonable probability of acquittal under the facts of the case. And it's that determination that Brown was bound to establish to be arbitrary, essentially. And the Commonwealth submits that he's failed to do so. First, because Mr. Osborne's testimony was to the conceded fact that he ate at this restaurant before the murder. Mr. Osborne's testimony could not establish the time of his departure. And secondarily, because the evidence was overwhelming. Well, why would you say that he could establish the time of his departure? If you look at the facts as I understand them to be, sunsets at 723, twilights at 750, he is consistent, that is Osborne, in saying that he recalls they left after dark. On the other hand, the state's witnesses seem inconsistent, both as between themselves or among them, as well as individually, their testimony seems inconsistent. But one thing they do seem to be consistent on, Tamika and her mother, is that there were some number of people, one of whom they identified as the shooter who did some pointing, and at that time, it wasn't dark yet, and that at some period of time afterwards, it varies depending on who you're speaking to, but sometime between 5 and 20 minutes afterwards, the shooting occurred. Now, how can it be that there's no reasonable probability, I don't think it's arbitrary, I think it's reasonable probability that we're looking at, how can it be that there's no reasonable probability that this affidavit, potential testimony from Osborne, would not make a difference here, would not satisfy the prejudice? Well, to back up, there are a couple of inferences that are drawn in terms of the time required to get to West Philadelphia in the time of darkness. The interval varied, Tamika said it was sometime more than 5 minutes, Ligon said it was 15 to 20, the magistrate selects 20 minutes, then there's a possible arguable stop of the barrage, Brown says it's at one point in his testimony for just a second, elsewhere from 5 to 10 minutes, and the magistrate and district court assume that it's 10 minutes. The drive from TGF Fridays, they pick 15 minutes, which is Brown's, presumably self-interested testimony at trial, not a statement, it's a scoff law, and adjudicated to disregard traffic signals, etc. And then, finally, at the time of darkness, the sunset was 7.23, and I just add that it's only the common law that has submitted any evidence about that, about finally, any of this darkness was not presented to the state court, and all of the defense witnesses said it was dark far earlier. Now that's an important point in your argument, is it not? I mean, it goes to the point as to whether or not there was properly an evidentiary hearing in this case. If there's not an evidentiary hearing, you don't have those key facts in the record. Yeah, I mean, we've endeavored to give the federal courts as much evidence as we could. It's not our burden, and I think it goes throughout the lower court of appeals. It's a misunderstanding of the burden. Are we required to disregard that if we find that the evidentiary hearing was improper? I think so, Your Honor, but nevertheless, the issue of sunset really doesn't change things in this case, because, I mean, we showed, we tried to kind of exhibit, at least, that the magistrate presumes absent, and so does the district court, absent any evidence in the record that it was dark only at 7.50. He presented no evidence that it could be dark, which is a very general subjective term, that it could not be dark at 7.49. The whole point that my question derived from was your statement that Osborne's testimony as presented through the affidavit didn't speak to time when, if you look at all of the evidence, but particularly with Osborne's statement that it was after dark when they left, you put it all together, you can reasonably draw an inference that it would be difficult to be in two places at one time. But not at all, because the time frames involved allowed ample time for Mr. Brown to leave the restaurant when it was dark, and still allowed an ample time to come at the murder, even allowing many of the intervals and stops that are in his, if you make inferences in his favor. I mean, there are countless scenarios, and we tried to sort of outline them in that exhibit, giving you a sense of just how many possibilities there were for Mr. Brown to get back. And then you must take that within the context of the record as a whole, in which you have two eyewitnesses, which the district court itself describes as the magistrate, excuse me, describes as positive, unshaken, and not weakened by any prior failure to identify. Aren't you supposed to be focusing on the district court's opinion? Well, to the extent he adopted the magistrate's, it's both. I mean, he adopted quite a bit of the lower court's opinion, and then botched it to some extent. Talking about opinions we should be focusing on. Which opinion of the state court should the district court, and should we look at? It's the superior court, because that's the intermediate appellate court. And the district court looked at both, did they not? Yes, and to the extent there was an examination of the deficiency of the analysis, I think the court justifiedly felt some consternation about that portion of the analysis. But I think that clouded the court's judgment as to prejudice problem. Okay, let me ask you this question, Ms. Palmer. In order to adopt your position, do we have to find that Shamil is consistent with Strickland? No, let me back up. The court applied Strickland appropriately. Pennsylvania law is clear that under Pierce, in most cases, consistent with the Pennsylvania federal standards are none of the same, effectively. Well, this Pennsylvania Supreme Court says that, right? Yeah. But in this case, it's pretty clear that they applied Shamil. Well, I mean, is your concern with what portion of the standard is somehow diluting from Strickland? Well, my point is, we have not found, this court has not found that Shamil is the equivalent of Strickland. And my question was, do we have to find that to support you? I think that the Pennsylvania standard is consistent with Strickland. There's no doubt. So you think that if we do, you think it's the same and it doesn't matter? I don't think it matters. The sub-test as to uncalled witnesses, I mean, you have to remember, this is a high-volume state court. And to the extent they formulated a sub-test to help them. Which is a high-volume state court? The Superior Court. The high-volume federal court. What does that mean? Well, they haven't developed a sub-test for uncalled witnesses that hasn't been formulated precisely the same way in the federal law. But the federal cases are consistent. If they apply a test, and looking at the PCRA court's determination, if they apply the wrong test, we're not supposed to give them a waiver just because they're high-volume, are we? No, I'm saying that the sub-test is the only real potential deviation. But none of this pertains to prejudice. Why shouldn't the Superior Court and the Supreme Court analyze these cases under Strickland, rather than choosing to analyze them under Shamil? Well, I think they cite Strickland, and they cite Pennsylvania cases upon Strickland, and there's nothing inconsistent between them. And the state courts are obligated and entitled to applying their own case law in reference to Pennsylvania Supreme Court cases as appropriate. But with the prejudice determination, even if you could say that there were... Well, they complain sometimes about what we do. I know, I know. But, you know, what we do would be made easier if they applied what we say. But there... I guess I shouldn't say all this if they pick this up on the record. Well, but there's no difference. And I think that the prejudice determination bears that out. If you look... And I know Your Honor take your obligation seriously to read the record, but there, I know, an e-trial would not be given to a first-degree murderer without a firsthand review of the record and the trial transcript. And there's no way that you can walk away from such a review with any doubt whatsoever about Brown's failure to meet the prejudice standard. If you look at what the state court opinions say, they describe the multiple eyewitness identifications of Brown by people who knew him, who had known him for many years. This is not a failure identification case. This is not an obstructed... There is not one witness who is consistent in their description, either consistent with their own testimony or consistent as it relates to others' testimony. If this person was so well-known, it would appear that there would be some consistency somewhere. I think that's the weakest part of this. I agree with you, Your Honor. I would have to do this back to everybody. The weak is on the stand, as I understand it, talking about reviewing the record. And when the clothing that was recovered from Mr. Brown's dwelling is presented, she says that's not what he had. So it's presented as these are the clothes he was wearing. Then she says, no, that's not what I described. And by the way, that's different again from what she described at various times in the past as to what the shooter was presumably wearing. So I'm not getting the consistency that you're alluding to. I think Your Honor is troubled by something that did not leave in trouble the district court or the magistrate in their view of the evidence in terms of the force and the consistency of the identifications by Tamika and Yvonne Rory. And also the prosecutor did the work on when you know someone very well and your focus is not going to be on the use of their clothing, where she described the hat and his physical appearance. Everything was consistent. And he was put at the scene by even the defense witnesses. And where he's claiming that he wasn't even there, it's highly problematic for him that he was placed there practically by everybody and that his car was placed there, which he claimed was with him in Center City, and that his friends, who he claimed were with him in Center City, were also placed there. As the prosecutor said, you have to alibi not only yourself, but your friends and your car. And he failed in every respect to do that, whereas maybe he didn't even want to put him there. All right, Ms. Palmer, we gave you a little extra time, but we're here to find the other bottle. Okay. Mr. O'Donnell? Good morning, Your Honors. Senator O'Donnell, on behalf of Anthony Brown. Getting to the point that Judge Greenwald was raising, Yvonne had already testified that she saw Camila Blattimer with Anthony Brown at 8 a.m. Move that microphone out of the way. I apologize. That she saw Anthony Brown at the scene at 8 p.m. Who did? Yvonne O'Rourke, the victim's daughter. Yes. Testified that she saw Anthony Brown at the scene at 8 p.m. With Camila Blattimer. Which would be about 20 minutes before the time and the place you broke down. Exactly. Pointing down the street. For Mr. Brown to have been there, he would have had to leave TGI Fridays. During a period of time prior to it being dark. Well, why are you assuming she was accurate that it was 8 o'clock? It was 8.06, 8.09. Well, I got you 14 and a half. That's a testimony. That's what we have as testimony. So you argue that we're supposed to believe you that the jury was wrong to believe three eyewitnesses who fingered the shooter. But that same jury that wrongly believed them fingered a witness who was a shooter who was known to them. Somehow miraculously knew that it was precisely 8 o'clock at the time he was there. Isn't that asking us to do something out of our edge? If Mr. Osborne was permitted to testify, the jury would have had an unbiased witness. There's two competing claims here. There's Mr. Brown, a familial alibi. And then there was the victim's family, who was obviously very upset and hurt. His family, he was died at the scene. That's correct. Okay, the jury apparently didn't believe him. Because he had two female cousins who testified on his behalf. It was a familial alibi. They were able to be impeached. Mr. Osborne. They weren't sure what time he left. Well, they knew it was dark. Dark as ever. Well, we have the time periods, the sunset and twilight. Let me talk about that time period. That time period was not in the record before the state court, was it? No. Okay. What they said was that the witness who testified at 8.15 from TGI Friday, that witness was bright in the testifying of that fact. Okay. But the time periods as to sunset and darkness were not in the state court record. That's correct. So we really can't, if we find that the evidentiary hearing was improper here, we can't look at those facts, can we? Not those facts. It was in the record, though, that he was stopped and got a ticket at either 6.41 or 6.43, correct? Correct. All right. So are those, I presume Judge Fisher's question is if you take out 7.23 and 7.50, the point of sunset and twilight, which apparently were not in the record, you do have some parameters by presumably an unimpeachable ticket. Correct. 6.41 or 6.43. And then varying person's testimony, you referred to Kareem at 8, another witness saying he went to TGI at 8.15. Correct. So those are the parameters. That's correct. What testimony at the federal hearing is the best evidence to prove your point that the result probably would have been different? Mr. Osborne. Okay. And Mr. Osborne said exactly what at the federal hearing. The election is that he indicated that he was concerned about Mr. Brown and his partner because they were late, they were loud, he was concerned that they were going to leave without paying, and that they didn't pay and he noticed that they left and it was dark outside. And where is that testimony found in the state court record? I believe, well, I think it was an affidavit to that effect, which they were attempting to get an inventory here, which was denied at the state court level. And why was that inventory denied? Well, I think it was an unreasonable finding of fact as well as an unreasonable application of the law. The affidavit to which you just referred, was that information presented to the court, the state court, during the first state court hearing? I'm not quite sure. There was a hearing in the state court. No, there wasn't. That's inevitable. The evidence that was provided in the state court. Everything is in the record, yes. All the affidavits, Mr. Osborne has an affidavit in there, Mr. Riggs has an affidavit in there, Mr. Boyd has an affidavit in there. And why was it wrong for the state court to conclude that this evidence about it being dark, et cetera, probably would not have made a difference in light of the eyewitness testimony that I was the shooter? Well, I think they concluded on multiple, and I think there was on multiple levels. I think first was the failure of trial counsel to hold a death penalty case in an adequate investigation. That was a big thrust of the argument at the state court level and at the federal level as well. Three days before you go and you do a death penalty trial, you have an investigation. The claim here is failure to file notice of an alibi defense. That's correct. Okay. So it's not failure to make an adequate investigation. Both. Mr. Shabazz knew. Prior to a preliminary hearing, after speaking to Mr. Brown, that he had an alibi, that he was at TGI Fridays and there was a witness named, or there was a witness named Stacy who waited on him. And Mr. Shabazz indicated that he was going to do the investigation. He was going to go to TGI Fridays. I'm an investigator, do the investigation. So that's 23 months before the trial. Mr. Grievous gets to the case, the investigator, three days before the trial starts. And on the sixth day of trial, has two witnesses, Mr. Stamets and Mr. Osborne, in the courtroom ready to testify. All right. Now, if that's what... They didn't even testify. Well, the common pleas judge did not allow them to testify. And there was a proffering on Osborne at that time. I don't recall directly. I don't recall, Your Honor. I don't want to misrepresent anything to the court. I don't think there was any proffering. I don't think there was, but I don't... It certainly wasn't as detailed as the affidavit that came after the conviction, right? No. So how does the state trial judge make a mistake in precluding that testimony then? Well, it goes to the fact that Mr. Shabazz is ineffective in his ability to communicate the fact that he had an unimpeachable witness here that was going to testify favorable for his client. Go ahead. I thought that the state court judge held that it was cumulative because the then-defendant had presented the two witnesses, his cousin and the cousin's friend, each of whom saw him at TGI on Friday, so that the state court said, okay, those two I'll allow, but the other two... Well, there were three. The third, the fifth, didn't testify, but the two, Stacy and Osborne, weren't permitted to testify. I thought principally because of a finding that it was cumulative, and I thought your argument was the mistake there is that you have a non-familial witness, not involved in the scene in any way. I thought that's correct, Your Honor. The idea that it was cumulative, incorrectly so, because Mr. Osborne was a disinterested witness. There was a battle going on between the parties, and a jury was left with two conflicting counts. You had Mr. Brown's family testifying to an alibi, and you had the victim's family, who was obviously making, I believe, serious errors in their notification. It goes back to the fact that Mr. Shabazz did an alibi investigation. He didn't properly prepare the case, and that throughout the entire determination that the commonplace court, the trial level, and the disciplinary court level, they failed to give Mr. Brown an evidentiary hearing. So these issues could be... Mr. Brown, he has certain obligations in order to earn the evidentiary hearing in the state court. He did that. How did he discharge those duties? How is he diligent in presenting what he needed to present to the state court? His affidavits. Where are the records at? I don't have them. Let's look at the affidavits. I don't have them in front of me. You don't have them? It's Mr. Breedis' affidavit. Mr. Brown's affidavit. Mr. Osborne's affidavit. I believe Mr. Stemmett's had an affidavit as well, which was presented to the state court. I believe it was delivered at the PCRI hearing at the common place level. All that was presented by 2017. Okay, let me ask you this question, Mr. O'Donnell. What prong are you proceeding under? Confident two or unreasonable application? Two straight cases where you had this issue. What are you proceeding under? I understand that Mr. Osborne... I'm sorry. Let me go to the line of questioning I asked Ms. Palmer. Do you argue that Shamil was different than Strickland? Yes. If you say it is, how is it? It created a higher standard. It requires that the situation that the witness is testifying, the exculpatory, that's not at all what Strickland holds. Can't that be argued that that's just merely an interpretation of Strickland? In Shamil's case? Yes. Sorry, I don't... Can it be argued that the exculpatory part of Shamil is nothing more than an interpretation of the reasonable probability standard? I don't think so. I think you're holding a standard that's unreasonable because you don't bother amplifying that you're considering the totality of the circumstances. I think that's crucial. I think that the way it's worded and the way it's applied, it's applied in an unreasonable manner. Now, you acknowledge we have to follow Richter. Correct. I don't think it affects this case. You don't think it affects this case? No. You don't think it makes it clear that the standard is highly deferential? I agree, but I think it was always... I think Richter just reaffirmed what was there. I think everyone realized it was highly deferential and there's a presumption of... Obviously, there's a presumption of correctness. What about color, though? Color makes clear that a state court can't be unreasonable in failing to find facts or interpreting facts that are never presented to it. Isn't that precisely what happened here? Mr. Brown presented a series of facts to the federal court that were never presented to the state court. No, I think there was a sufficient amount of facts presented in the affidavits before the PCA court that the basis of bringing an evidentiary hearing at the federal court was to go into an amplifier, have testimony of those witnesses that shouldn't happen at the state court level. I was looking at the statement. The Oswald statement is the one that Green has recounted from the interview, right? Correct. All he says there is, I don't know specifically what time he left, but I know it was dark outside. That's right. Dark outside doesn't narrow it down. I mean, 732, 740, 750. I mean, that's about as nebulous as it gets. We're dealing with the probabilities here. We're not dealing with certainties. There's a reasonable probability that had he testified, the jury would have probably made a different decision. How can you say that when you've got eyewitnesses? I mean, we see a lot of cases that rely strictly on circumstantial evidence. Here, you've got three eyewitnesses. They're picking Brown out in a photo way. They're pointing him at trial and saying he did it. He was known to them. And then you put all that on the scale, and up against the stack on the scale, you have a guy who says, I don't know the time they left the restaurant, but it was dark out. I mean, and that's going to give you a reasonable probability. You also have the family members who testified that he wasn't there. Well, so now he wasn't there. He wasn't really left the restaurant late and got there late. Now he wasn't there at all. Well, he got there late. But the thing, the situation is that Osborne gives credibility to the family members. You have the people who testified for the state that the family members are the victim. They had an interest in Mr. Brown. You have the individuals who all testified for Mr. Brown, his cousins, who were impeached because of familial relationship. Now Mr. Osborne gives credibility to Brown when he says, yeah, he was at TGI Friday's. And I thought the state conceded he was at Friday's. I don't believe that trial they did. What does the receipt say? There was a receipt for Friday's. What does it say? TGI Friday's. What does it say? I don't know. I'm not involved. Well, that would exonerate your client, right? It might theoretically exonerate your client. What does it say? It was never presented to the state court. It was never presented. You couldn't find it. And the state court can't draw an adverse inference from the fact that a receipt that everyone knew existed from the very restaurant, the very incident in question, was never presented to the state court? I think it was. It was never presented in a jury trial. It was never presented to the state court at PCIA. The state court can't consider that? I think we have to consider Mr. Osborne's testimony and what he would have put forth. Also, we have to consider the fact that Mr. Shabazz didn't do an investigation that was credible at all. This man is being on trial for his life, and three days before trial begins, an investigation with the jury starts and produces these witnesses. So I think the court has to consider the fact to investigate, as a very important claim here, that Shabazz has the receipt. But he's good at the law. I believe the receipt was present, Your Honor. Going back to my earlier question, with all these facts, and I can add a couple more. I mean, witnesses said that Fingers and Johnson were at the scene. With all these facts, going back to Richter, how can you say that the Superior Court's finding in the PCIA case was an objectively unreasonable application of Strickland? I think they held Osborne's testimony to be... Well, first of all, they adopted the fact that his testimony would have been cumulative, which was unreasonable. And then I think it also indicated that he... But you're weighing it was dark outside versus all of the testimony about Brown, Johnson, Fingers, I.D. of people being there. And an objectively unreasonable standard under Richter is a high one. It's a very, very deferential standard. And we're not here with a clean slate. We don't have a clean slate. We can't look at this in a clean slate. We have to look at what the State Court found. And was it objectively unreasonable? I submit it was, Your Honor. You submit it was? Yes, sir. Okay. Thank you very much. Thank you very much. Ms. Palmer? Thank you, Your Honor. I just wanted to address a few of the... Sorry. A few of the factual issues that came up during counsel's discussion. First of all, I think it's a very important fact, and I want to direct Your Honor's and Jaber's attention to pages 649 and 650, transcript date 925 of the trial. Where are the records, though? This is during Yvonne Ward's testimony, and she specifically... Can you give us page 649? This is page 649 of transcript date September 25, and it's Yvonne Ward's testimony in which... I'm sorry. It's page 652. Excuse me. I don't have the appended cite, but I can provide it. And she states that it was dark at the time when people at the top of the block came up, and she pointed down and said... Pointed down to the victim at the end of the block, because I think earlier Judge Greenway had mentioned that it was light out, and we'll have the case, and the timeline would be more problematic. But she was clear in her testimony that it was dark by then, and so that creates more nebulousness in terms of the time frame that Brown is hanging his hat on. Is that the only place in the record that we have with regard to her assessment as to what approximate time it was? And that's another thing. She never said it was 8 o'clock. She estimated the time frame, and people have always been trying to work back. But she varied. I mean, as the prosecutor pointed out, there are differences. I mean, Tanika said it was 1 o'clock minutes, but she couldn't be sure, and Yvonne said at any time she couldn't be sure. But just to back up for a few minutes, because I only have a minute of time, the prosecutor did concede that Mr. Brown went to the TGIFIs in his summation, which really makes it all the more important to the Strickland analysis, because the commonwealth's argument to the jury was, you know, fine, he went to the restaurant. It didn't matter. Secondarily... But, of course, I'm sure the trial judge told the jury that argument of counsel isn't evidence. Absolutely. But it's a fact conceded by the commonwealth. Therefore, Mr. Osborne would only corroborate a fact that the commonwealth conceded to the jury. But he didn't... The way he conceded, the way the prosecutor conceded was dark. No, and, you know, it wasn't an issue, but it didn't matter, because elsewhere it was made clear by the defense that it was dark when they left. I mean, the defense witnesses themselves said it was dark. So I could have presented no evidence at all, and Ms. Corbin had no option other than to... Where in the record did the defense witnesses say that it was dark at the time Brown left the TGIFs? Brown himself... I can send you to the page of my brief. I left it back there. But a number of defense witnesses said it was dark at around 7.30 when the two, the cousin and roommate, said it was dark when they were walking over. It was already getting dark. And don't forget that it was also... The cousin and roommate don't remember when he left. Yeah. They just remember seeing him. Well, they claimed that it was after, you know, an hour later or something like that. But then they basically said they don't really remember seeing him left. Yeah. They said he couldn't have left before they did because of where they were situated, which was this sort of deus ex machina. Oh, they just happened to be there. And the other thing is, you know, the other thing is Mr. Alford cooperated the fact that those of him were even at the restaurant because that was very much thrown into question. The prosecutor said this is highly, you know, incredible that they just happened to be there to give him an alibi. And Mr. Osborne couldn't even... He couldn't say that they were there. I mean, there's nothing in dispute that Mr. Osborne can have to. And I would just want to point to the family bias. I'm sorry. Wait a second. You mean they, the cousin, and his friend? That's what you mean? That Osborne couldn't corroborate the family? Yeah. There was something in dispute about the alibi that Mr. Osborne could corroborate in a meaningful way. I don't know whether it would be worth the time or whether those women were even at the restaurant. But all I can say is, Doc, it really didn't matter. All right. Ms. Palmer, I think we understand your position. And to both counsel, we thank you for excellent arguments and well-written briefs. And we will take the matter under advice. I did come to my attention that volume two of our transcript was not properly filed electronically. I can read you that. I also made CDs of all the, if it's helpful to counsel, I've read some to Sal, but it's electronic versions that I can't remember. Well, why don't you take that up with the clerk to make sure that the record's totally accurate. It's very helpful. It just makes it easier to search for words like that. Okay. Thank you very much. And we thank counsel.